## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

NEUROPRO SPINAL JAXX, INC.
D/B/A SPINAL JAXX,

                Plaintiff,

v.

MEDTRONIC PLC, MEDTRONIC, INC.,
MEDTRONIC USA, INC., MEDTRONIC
SOFAMOR DANEK USA, INC.,
MEDTRONIC SOFAMOR DANEK, INC.,

                Defendants.

No. _____

**PATENT CASE**

**JURY DEMAND**

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff NeuroPro Spinal Jaxx, Inc., d/b/a Spinal Jaxx ("Plaintiff") files this Complaint ("the Complaint") for infringement of United States Patent Nos. 7,727,280 ("the '280 Patent"); 10,213,321 ("the '321 Patent"); and 11,141,289 ("the '289 Patent"), collectively the "Asserted Patents."

## THE PARTIES

1.      Plaintiff NeuroPro Spinal Jaxx, Inc., d/b/a Spinal Jaxx ("Spinal Jaxx") is a Delaware corporation with its principal place of business located at 2323 N Akard Street, #701, Dallas, TX 75201.

2.      Upon information and belief, Defendant Medtronic plc is a corporation organized and existing under the laws of Ireland, having its "principal executive offices" in Galway, Ireland. *See* Medtronic SEC Form 10-K for the fiscal year ended April 25, 2025.  *See*

https://filecache.investorroom.com/mr5ir_medtronic/829/MDT%20%28Medtronic%20plc.%29 %20%20%2810-K%29%202025-06-20.pdf_.pdf (last accessed Sept. 22, 2025).

3.    Upon information and belief, Defendant Medtronic, Inc., is a corporation organized and existing under the laws of Minnesota having a regular and established place of business in this District at Memphis, Tennessee. *See Avanos Med. Sales, LLC v. Medtronic Sofamor Danek USA, Inc.*, No. 2:19-cv-02754-JPM-tmp, 2021 WL 4527249, at *1 (W.D. Tenn. Oct. 4, 2021) ("Medtronic Sofamor Danek USA, Inc. is incorporated in Tennessee, with its principal office located in Memphis, Tennessee. . . . Medtronic, Inc. and Medtronic USA, Inc. are incorporated in Minnesota and each has a regular and established place of business in Memphis, Tennessee.") (cleaned up).

4.    Upon information and belief, Defendant Medtronic USA, Inc., is a corporation organized and existing under the laws of Minnesota having a regular and established place of business in this District at Memphis, Tennessee.  *See Avanos Med. Sales, LLC*, 2021 WL 4527249, at *1.

5.    Upon information and belief, Defendant Medtronic Sofamor Danek USA, Inc., is a corporation organized and existing under the laws of Tennessee, with its principal place of business in this District at 2600 Sofamor Danek Drive, Memphis, TN 38132. *See* Plaintiff Medtronic Sofamor Danek USA, Inc.'s Complaint, filed in this District on April 30, 2025, Case 2:25-CV-02474 [ECF No. 1] at ¶8 and Civil Cover Sheet identifying its county of residence as Shelby County, TN [ECF No. 1-1]; *see also Avanos Med. Sales, LLC*, 2021 WL 4527249, at *1.

6.    Upon information and belief, Defendant Medtronic Sofamor Danek, Inc., is a corporation organized and existing under the laws of Tennessee, with its principal place of

business in this District at 2600 Sofamor Danek Drive, Memphis, TN 38132. *See Avanos Med. Sales, LLC*, 2021 WL 4527249, at *1.

7.      Defendants Medtronic plc, Medtronic, Inc., Medtronic USA, Inc., Medtronic Sofamor Danek USA, Inc., and Medtronic Sofamor Danek, Inc. are referred to collectively as "Medtronic" herein, unless otherwise indicated.

## JURISDICTION AND VENUE

8.      Plaintiff brings this civil action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1 et. seq., including 35 U.S.C. §§ 271, 281-85. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338.

9.      As alleged further below, Medtronic directly and indirectly infringes the Asserted Patents, including in this District, by making, using, selling, offering to sell, and/or importing infringing products and performing infringing methods in the United States, and inducing and contributing to the direct infringement by others, as set forth herein (the "Medtronic Accused Instrumentalities"), which include but are not limited to (1) Medtronic's expandable fusion cages, including those marketed as Elevate, Catalyft PL, Catalyft PL40, and comparable products and methods for using the same; and (2) Medtronic's Grafton DBF Inject and comparable insertion products and methods for using the same.

10.      The Court has personal jurisdiction over Medtronic. Medtronic has continuous and systematic business contacts with the State of Tennessee. Medtronic transacts business within this District and elsewhere in Tennessee. *See Avanos Med. Sales, LLC*, 2021 WL 4527249, at *1 ("Medtronic Sofamor Danek USA, Inc. is incorporated in Tennessee, with its principal office located in Memphis, Tennessee. . . . Medtronic, Inc. and Medtronic USA, Inc. are incorporated in Minnesota and each has a regular and established place of business in

Memphis, Tennessee.") (cleaned up).  Further, the Court has jurisdiction over Medtronic based on its acts of infringement in this District and elsewhere in Tennessee.

11.     Upon information and belief, Medtronic transacts substantial business in the State of Tennessee and this District. Medtronic has committed acts of infringement in this District by, among other things, making, using, offering to sell, and selling products, and performing methods, that infringe the asserted patents, including the Medtronic Accused Instrumentalities as alleged herein, as well as providing service and support and otherwise knowingly encouraging infringing actions by its direct and indirect customers and end users in this District and elsewhere, which customers and end users also directly infringe the asserted claims. Upon information and belief, Medtronic, directly or indirectly, participates in the stream of commerce that results in products and methods, including the Medtronic Accused Instrumentalities, being made, used, offered for sale, and/or sold in the State of Tennessee, imported into the United States to the State of Tennessee, and/or performed in the State of Tennessee.

12.     Venue is proper under 28 U.S.C. § 1400(b) because Medtronic has committed acts of infringement in this District (both directly and indirectly) and has regular and established places of business in this District. Medtronic maintains regular, physical, continuous, and established places of business in this District, including places of business that Medtronic has ratified and controlled as its own. Medtronic has committed acts of infringement in this District, both directly and indirectly, as alleged herein. Upon information and belief, Medtronic, including via acts of joint enterprise and agency as alleged herein, has regular and established places of business in this District at least at 2600 Sofamor Danek Drive, 1800 Pyramid Place, and 5300 Airways Blvd in Memphis. *See* Ex. 10, Medtronic plc Irish Annual Report for the Financial Year Ended April 25, 2025 at page 111 (stating that wholly owned subsidiaries Medtronic Sofamor

Danek, Inc. and Medtronic Sofamor Danek USA, Inc. occupy 2600 Sofamor Danek Drive) and

page 114 (stating that wholly owned subsidiary SpinalGraft Technologies, LLC occupies 5300

Airways Blvd).  Further, Medtronic has voluntarily litigated in this District and this Court has

found that Medtronic has a regular and established place of business in this District.  *Avanos*

*Med. Sales, LLC*, No. 22021 WL 4527249, at *1 ("Medtronic Sofamor Danek USA, Inc. is

incorporated in Tennessee, with its principal office located in Memphis, Tennessee. . . .

Medtronic, Inc. and Medtronic USA, Inc. are incorporated in Minnesota and each has a regular

and established place of business in Memphis, Tennessee.") (cleaned up).

13.    Medtronic represents to the public that its place of business at 2600 Sofamor

Danek Drive in Memphis is Medtronic's "Spinal and Biologics Business Worldwide

Headquarters" and it has thus ratified this address as one of its regular and established places of

business in this District.[1]

---

[1]Ex. 1, https://www.medtronic.com/content/dam/medtronic-com/us-en/patients/cervical/documents/pat-ed-presteiger-lp-patient-edu-brochure.pdf; *see also* Ex. 2, https://www.medtronic.com/content/dam/medtronic-wide/public/united-states/products/spine-orthopedic/complex-spine-solutions/unid-spine-clinical-brief-data.pdf; Ex. 3, https://www.medtronic.com/content/dam/medtronic-com/us-en/patients/conditions/conditions-back/documents/metrx-patient-brochure.pdf.



Medtronic
Spinal and Biologics Business
Worldwide Headquarters

2600 Sofamor Danek Drive
Memphis, TN 38132

14.    The Economic Development Growth Engine ("EDGE") for Memphis approved Medtronic's plan for a one million square foot "manufacturing and distribution center" at 5300 Airways Blvd. in Memphis, which center replaced Medtronic's "376,000 square foot Memphis facility at 4340 Swinnea Road."[2]  According to Medtronic in its "Irish Annual Report" for the Financial Year Ended April 25, 2025, at least its wholly owned subsidiary SpinalGraft Technologies, LLC uses the 5300 Airways Blvd. facility in Memphis. *See* Ex. 10 at page 114.

15.    Medtronic employs a significant number of people in this District, including in Memphis, and advertises for job positions in this District. For example, as of September 12, 2025, Medtronic had job postings on LinkedIn.com for positions in Memphis, including but not limited to the following:

---

[2] Ex. 4, https://database.edgemem.com/pilots/pilot/273/#:~:text=The%20project%20includes:%20*%20$133%2C350%2C000%20total%20project,Memphis%20facility%20*%20Support%20only%20Medtronic%20activities; *see also* Ex. 5, https://www.rsandh.com/projects/medtronic-manufacturing-distribution-facility/.





16.     Dozens of people have LinkedIn profiles indicating that they work for Medtronic in Memphis, including certain Medtronic leaders:

- **Richard Watkins** (Medtronic's Strategic Legal Counsel) who "advises business leaders in global operations and supply chain";[3]

- **Kip Roberts** (Medtronic's Vice President – Neurosciences Mergers/Acquisitions & Strategy) who "currently leads Business Development, Portfolio Management & Strategy for Medtronic's Neuroscience portfolio/division";[4]

- **Nate Falk** (Medtronic's Regional Director) who was "responsible for delivering over $64 million in sales revenue . . . in FY'24";[5] and

---

[3] Ex. 6, https://www.linkedin.com/in/richdwatkins/

[4] Ex. 7, https://www.linkedin.com/in/kip-roberts-836ba47/

[5] Ex. 8, https://www.linkedin.com/in/nmfalk/

- **Joana M. Marzec** (Medtronic's Global Society & Physician Relations, Cardiac Surgery) who unlocks "the power to transform processes to enhance customer experience and advance customer centric culture."[6]

17.     Upon information and belief, Defendant Medtronic plc owns and controls Defendant Medtronic, Inc., Defendant Medtronic USA, Inc.,  Defendant Medtronic Sofamor Danek USA, Inc. and Defendant Medtronic Sofamor Danek, Inc. regarding decisions concerning the Medtronic Accused Instrumentalities. For example, Medtronic plc refers to all of its many wholly owned subsidiaries (including Defendant Medtronic, Inc., Defendant Medtronic USA, Inc.,  Defendant Medtronic Sofamor Danek USA, Inc. and Defendant Medtronic Sofamor Danek, Inc) collectively as "the Group."  *See* Medtronic plc 2025 Irish Annual Report (Ex. 10) at page 1. Further, Defendant Medtronic, Inc., Defendant Medtronic USA, Inc.,  Defendant Medtronic Sofamor Danek USA, Inc. and Defendant Medtronic Sofamor Danek, Inc are wholly owned subsidiaries of Defendant Medtronic plc and share a unity of interest and ownership. For example, upon information and belief, at least some of the Defendants have overlapping officers.

18.     Upon information and belief, Defendants are engaged in a joint enterprise to monetize the Medtronic Accused Instrumentalities in this District and throughout the United States, including products that require FDA approval to market. Defendants are jointly and severally liable to Plaintiff for all damages resulting from their acts of infringement. For example, on information and belief, Defendant Medtronic, Inc. is the owner in all rights to the trademark "Medtronic" with the USPTO. Patent rights appear to be spread across a variety of Medtronic affiliates, but under common control and direction representing a unity of interest and ownership. Defendant Medtronic, Inc. and other Medtronic affiliates have prosecuted IPR

---

[6] Ex. 9, https://www.linkedin.com/in/joannammarzec/

proceedings and/or brought enforcement actions in district court on behalf of Medtronic.

According to their own public filings and statements, Defendant Medtronic plc, Defendant

Medtronic, Inc. and Defendant Medtronic Sofamor Danek USA share an office located at 710

Medtronic Parkway in Minneapolis, MN. Medtronic represents that this same address is

Medtronic's "Operational Headquarters"[7]  Indeed, according to Medtronic's own 2025 Irish

Annual Report, over fifty Medtronic wholly owned subsidiaries share the office at 710

Medtronic Parkway in Minneapolis, MN, further demonstrating unity of interest and ownership

and that the entities are operationally indistinguishable. Ex. 10 at pages 103-115 (under column

entitled "Registered Office and Location of Incorporation").

19.    On information and belief, Medtronic also has one or more regular and

established places of business in this District through its authorized sales/customer service agents

in this District ("Customer Agents"). Medtronic manifests assent to the Customer Agents that

they shall act on Medtronic's behalf and subject to its control, and the Customer Agents manifest

assent or otherwise consent to act. Medtronic maintains interim control over the Customer

Agents' work, in which they rely on interactions and Medtronic's instructions within the scope

of their work.  For Customer Agents to satisfy Medtronic's strict "compliance requirements,"

and for Medtronic to control its Customer Agents, Medtronic provides voluminous materials, a

sampling of which are listed below (*see* https://www.medtronic.com/en-us/our-

company/governance/distributor-compliance.html):

- **Reference Tool And Examples**, (summarizing compliance tools provided by Medtronic
  to its Customer Agents) Ex. 11;

---

[7] https://www.medtronic.com/en-us/our-company/locations.html (last accessed Sept. 19, 2025).

- **Distributor Compliance Presentation** (slides discussing Medtronic's compliance requirements of its Customer Agents), Ex. 12;

- **Code of Conduct** (required for Medtronic's Customer Agents), Ex. 13;

- **Compliance Guidelines** (detailed compliance guidelines required by Medtronic), Ex. 14;

- **Conflict of Interest Declaration** (to disclose actual or potential conflicts of interest); Ex. 15;

- **Distributor Training Attendance Form** (used to establish documentation that Customer Agents were trained according to Medtronic's instructions), Ex. 16;

- **Expense Reimbursement Form** (used to support and document any business travel, meetings and expenses related to interactions with customers), Ex. 17;

- **Sample Tracking Form** (for document samples provided to customers), Ex. 18; and

- **Quality Guidelines** (detailed presentation explaining quality and regulatory requirements), Ex. 19.

20.    These materials demonstrate control and provide Medtronic's Customer Agents with compliance and quality standards, training, record keeping and inspection requirements, regulatory and quality requirements, conflicts of interest and other escalation requirements, instructions, marketing, brochures, training manuals, mandated policies and procedures, control agreements and contact information for sales and customer service agents (including the Customer Agents controlled by, in part, providing "Distributor Resources" discussed above).



*See* https://www.medtronic.com/en-us/our-company/governance/distributor-compliance.html.

21.     Therefore, the contracts between Medtronic and its Customer Agents establish (1) Medtronic has the right to direct and control its Customer Agents, (2) Medtronic has manifested consent that Customer Agents act on Medtronic's behalf, and (3) the Customer Agents have consented to act on behalf of Medtronic.

22.     The Customer Agents in this District sell, monitor, train, oversee use, and handle complaints and returns (according to the Medtronic policies and documents referenced above) of Medtronic's products that they obtain from Medtronic, including on information and belief the Medtronic Accused Instrumentalities. Such activities involve storage, transport, training, monitoring, and exchange of goods and services, and represent part of Medtronic's core business.

23.     Medtronic has established and ratified the Customer Agents' places of business because the contracts affect how they perform hospital set ups, approval of procedures to be performed at hospitals with Medtronic products, sales, training, handling complaints, and returns (according to the Medtronic policies and documents referenced above).

24.     The Customer Agents in this District have fixed geographical locations. They are regular and established because they operate in a steady, uniform, orderly, and methodical manner and are sufficiently permanent. These locations are Medtronic's because Medtronic has contractual rights with them as authorized distributors in the United States. Medtronic ratifies the Customer Agents' locations because it exercises interim control over their activities and holds out to the public that Medtronic's distribution, warehousing, marketing and sales of the products are being performed at the Customer Agents' locations in this District.

## **BACKGROUND**

25.     The spinal column, or backbone, is the central support structure of the body; it is comprised of 33 stacked vertebrae that protect the spinal cord. Between each of the vertebrae are discs, which are gel-like cushions that act as shock absorbers and keep the spine flexible. Injury, disease, or excessive pressure on these discs can cause degenerative disc disease or other disorders where the discs become thinner, allowing the vertebrae to move closer together, or where they become misaligned. As a result, nerves may become pinched, causing pain that radiates into other parts of the body, or causing instability of the vertebrae themselves.

26.     One method for correcting disc-related disorders is to insert a fusion cage between the vertebrae to act as a structural replacement for the deteriorated disc. The fusion cage is typically a hollow metal device made of biocompatible materials such as PEEK (polyether ether ketone) or titanium. Once inserted, it operates to maintain the proper separation between the vertebrae to prevent nerves from being pinched and it provides structural stability to the spine. Further, the inside of the cage is filled with a bone graft material that eventually fuses permanently with the adjacent vertebrae into a single unit. Use of older fusion cages required a highly invasive surgical procedure and significant recovery time.

### A. Asserted Patents

#### 1. U.S. Patent No. 7,727,280

27.    United States Patent No. 7,727,280 is entitled "Bone Fusion Device." The '280 Patent issued June 1, 2010, and names Gary R. McLuen as the inventor. The '280 Patent issued from United States Patent Application No. 11/357,319, filed on February 16, 2006.

28.    Plaintiff is the sole owner by assignment of all right, title, and interest in the '280 Patent and has standing to assert the claims in this Complaint.

29.    A true and correct copy of the '280 Patent is attached as Exhibit 20.

30.    The '280 Patent is presumed valid under 35 U.S.C. § 282(a).

31.    The '280 Patent generally relates to a novel expandable fusion cage for use in spinal surgery to correct disc-related disorders. The expandable device claimed in the '280 Patent allows for minimally invasive corrective surgery and a correspondingly shorter recovery time.

32.    Figures 14A and 14B of the '280 Patent illustrate aspects of certain non-limiting embodiments of the invention and are shown below.



Fig. 14A          Fig. 14B

#### 2. U.S. Patent No. 10,213,321

33.    United States Patent No. 10,213,321 is entitled "Bone Fusion System, Device and Method Including Delivery Apparatus." The '321 Patent issued February 26, 2019, and names Troy D. Knapp, Gregory C. Stalcup. Kreigh R. Williams, and Benjamin J. Remington as the

inventors. The '321 Patent issued from United States Patent Application No. 15/409,423, filed on January 18, 2017.

34.     Plaintiff is the sole owner by assignment of all right, title, and interest in the '321 Patent and has standing to assert the claims in this Complaint.

35.     A true and correct copy of the '321 Patent is attached as Exhibit 21.

36.     The '321 Patent is presumed valid under 35 U.S.C. § 282(a).

37.     The '321 Patent generally relates to a novel method, system and device for fusing vertebrae of the spine or other bones, including a bone fusion device and an insertion instrument that is secured to the bone fusion device via a coupling mechanism. The coupled device is able to be securely positioned between vertebrae using the insertion instrument with minimal risk of slippage.

38.     Figure 13 of the '321 Patent illustrates aspects of certain non-limiting embodiments of the invention and is shown below.



**Fig. 13**

### 3.  U.S. Patent No. 11,141,289

39.     United States Patent No. 11,141,289 is entitled "Bone Fusion System, Device and Method Including Delivery Apparatus." The '289 Patent issued October 12, 2021, and names Troy D. Knapp, Gregory C. Stalcup, Kreigh R. Williams, and Benjamin J. Remington as the inventors. The '289 Patent issued from United States Patent Application No. 16/239,882, filed on January 4, 2019. The '289 Patent is a continuation of Application No. 15/409,423, which was filed on January 18, 2017, and issued as the '321 Patent.

40.     Plaintiff is the sole owner by assignment of all right, title, and interest in the '289 Patent and has standing to assert the claims in this Complaint.

41.     A true and correct copy of the '289 Patent is attached as Exhibit 22.

42.     The '289 Patent is presumed valid under 35 U.S.C. § 282(a).

43.     Like the '321 Patent, the '289 Patent generally relates to a novel method, system and device for fusing vertebrae of the spine or other bones, including a bone-fusion device and an insertion instrument that is secured to the bone-fusion device via a coupling mechanism. The coupled device is able to be securely positioned between vertebrae using the insertion instrument with minimal risk of slippage.

44.     Figure 13 of the '289 Patent illustrates aspects of certain non-limiting embodiments of the invention and is shown below.

**Fig. 13**

## B. Medtronic's Pre-Suit Knowledge of Infringement

45.    In October 2010, Plaintiff presented an overview of its expandable-fusion-cage technology, named "Spinal Jaxx," in conjunction with the Congress of Neurological Surgeons meeting in San Francisco, CA. During that presentation, Dr. Benjamin J. Remington, a spinal surgeon and one of the named inventors on the '321 and '289 Patents, described the benefits of the Spinal Jaxx technology, including:

- Bone Graft can be placed in the device;

- Easy revision strategy;

- Can go in smaller than 7 mm;

- Sizing in various heights and lengths;

- Titanium threads and posts makes the device easier to see on X-ray;

- Better, more aggressive teeth;

- Sequential Distraction with metal sizer/distractor; and

- Surgeon driven engineering

46.    Dr. Remington also provided illustrations of both the fusion cage and insertion device:







47.    During the presentation, Dr. Remington explained that the technology was covered by certain claims of the '280 Patent. At least Newton H. Metcalf from Medtronic attended Dr. Remington's presentation in October 2010.

48.    Dr. Remington and other representatives of Plaintiff continued meeting with Medtronic and its representatives after October 2010, including at least meeting with multiple Medtronic representatives at the Spine Arthroplasty Society (SAS) meeting in Las Vegas, NV, in April 2011, including Tom Carls, Anthony Melkent, and Chris Lyons. Dr. Remington subsequently met with Mr. Melkent again in October 2011 at the Congress of Neurological Surgeons meeting held in Washington, D.C.

49.    During these meetings, Dr. Remington and the Medtronic representatives further discussed the Spinal Jaxx devices in more detail, and the Medtronic representatives expressed interest in purchasing the Spinal Jaxx device once Plaintiff completed pre-FDA-approval paperwork. Pursuant to and in reliance on these discussions, Plaintiff updated and shared lab data

and design information with Medtronic throughout the FDA-approval process, which was finalized in 2016.

50.    Dr. Remington subsequently learned that while Plaintiff was obtaining FDA approval and discussing various confidential design and lab-results details with Medtronic, Mr. Melkent and other Medtronic engineers were attempting to create a competing expandable device for spinal-fusion surgeries in-house.

51.    In May 2020, Plaintiff's representatives, including Chief Operations Officer John Green, again met with Medtronic representatives. During that meeting, Plaintiff provided further disclosure of its patent portfolio related to the Spinal Jaxx expandable fusion device and informed Medtronic that it held 17 patents granted in the U.S., along with 13 published U.S. patent applications and numerous foreign patents and patent applications. The presentation, parts of which are shown below, specifically identified, *inter alia*, the '280 Patent and the '321 Patent.



## Statistics on the Patent Portfolio

- 17 patents granted in the United States
- 13 US applications published but not yet granted
- 6 foreign patents granted
- 6 foreign applications published but not yet granted
- Many more applications in the US and abroad which have not yet published.

**Spinal Jaxx**                Spinal Jaxx Confidential                4

## Progression of the Patent Portfolio

- The original patent and application purchased by NeuroPro Spinal Jaxx in 2011:
  - US 7,727,280
    - Granted on 6/1/2010
  - US Patent Application 11/484,379
    - Became US Patent 8,187,332 Granted on 5/29/2012
  - These two patents contain the elementary core of the NeuroPro Spinal Jaxx technology platform.

**Spinal Jaxx**                Spinal Jaxx Confidential                6

52.    Upon information and belief, one in-house device Medtronic developed to compete with the Spinal Jaxx device bore the trade name "Elevate." Medtronic represents that the Elevate product embodies claims of U.S. Patent No. 9,445,919, titled "Expandable Interbody Implant and Methods of Use." Ex. 23 (downloaded on Sept. 19, 2025 from Medtronic's website at https://www.medtronic.com/content/dam/medtronic-wide/public/cema/customer-support-services/medtronic-us-patent-list.pdf).  The '919 Patent issued September 20, 2016, and names Stanley T. Palmatier, Keith E. Miller, Anthony J. Melkent, William D. Armstrong as the inventors. As discussed previously, at least Mr. Melkent knew or should have known that Spinal Jaxx had patents and applications covering this technology. The '919 Patent issued from United States Patent Application No. 13/329,845, filed on December 19, 2011. During prosecution of the '919 Patent, the inventors (of which Mr. Melkent was one) cited Plaintiff's '332 Patent—the patent that issued from the application Plaintiff identified in its October 19, 2010 presentation to Medtronic. On information and belief, Mr. Melkent was a key decisionmaker with respect to

whether Medtronic would sell the in-house product he and others developed or whether
Medtronic would source expandable fusion cages from Plaintiff.

53.     Further, dozens of patents issued to, and published patent applications submitted
by, Medtronic and its affiliates cite Plaintiff's '280 Patent. A list of these patents and published
applications is attached hereto as Ex. 24.

54.     At a minimum, Medtronic thus was aware there was a high probability of
infringement of the Asserted Patents, but it nonetheless made the deliberate choice to ignore or
avoid knowledge of its infringement. Medtronic acted with blatant disregard and conscious
avoidance of Plaintiff's patent rights despite an objectively high likelihood that its products and
methods infringed and continue to infringe the Asserted Patents.

## MEDTRONIC'S ACCUSED PRODUCTS AND METHODS

55.     On information and belief, Medtronic has manufactured, used, sold, imported,
and/or offered to sell products, and performed methods, in the United States that infringe the
asserted claims of the '280 Patent, the '321 Patent, and the '289 Patent.  Products and related
methods and instrumentalities which infringe technology claimed by the '280, '321, and '289
Patents include but are not limited to Medtronic's expandable fusion cages and associated
methods, *e.g.*, those marketed as Elevate, Catalyft PL, Catalyft PL 40, and comparable products.
Products and related methods and instrumentalities which infringe technology claimed in the
'321 and '289 Patents, include but are not limited to Medtronic's Grafton DBF Inject and
comparable insertion products.

56.     A brochure marketing some of the Medtronic Accused Instrumentalities published
by Medtronic can be found at https://thespinemarketgroup.com/wp-
content/uploads/2021/09/catalyft-pl-Brochure.Medtronic.pdf and is reproduced below (Ex. 25):









57.    The brochure indicates that Medtronic's Spinal and Biologics Business "Worldwide Headquarters" is located in this District at 2600 Sofamor Danek Drive in Memphis, TN.  On information and belief, Defendants manufacture, use, sell, offer to sell, and perform methods pertaining to the Medtronic Accused Instrumentalities (and induce others to use the Medtronic Accused Instrumentalities) in the United States and worldwide through Medtronic Sofamor Danek USA, Inc. and Medtronic's Spinal and Biologics Business Worldwide Headquarters located in this District.

## COUNT I — INFRINGEMENT OF U.S. PATENT NO. 7,727,280

58.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs as if set forth fully herein.

59.    The '280 patent underwent a thorough examination at the Patent Office and is presumed valid under 35 U.S.C. § 282.

60.    Medtronic has directly infringed and continues to directly infringe one or more claims of the '280 patent in violation of 35 U.S.C. § 271(a), by making, using, offering to sell, selling, exporting, importing, and/or performing the methods of the Medtronic Accused Instrumentalities.  Medtronic has and also induced and contributed to the infringement of others that use the Medtronic Accused Instrumentalities.

61.    For illustration, the following paragraphs describe how certain exemplary products of the Medtronic Accused Instrumentalities infringe at least claim 15 of the '280 patent. Plaintiff's allegations of infringement are not limited to claim 15 or to the specific exemplary products or methods referenced herein, and Plaintiff may identify and disclose additional infringement through discovery and in infringement contentions under the Local Patent Rules.

62.    The Medtronic Catalyft PL Expandable Interbody System ("Catalyft PL") and the

Medtronic Catalyft PL40 Expandable Interbody System ("Catalyft PL40") infringe at least claim

15 of the '280 patent. Upon information and belief, the Catalyft PL and Catalyft PL40 infringe

at least claim 15 of the '280 patent in materially the same way, with the Catalyft PL40 providing

"40% more surface area distally" compared to the Catalyft PL:

## Two footprints available



**Catalyft™ PL**

Designed for TLIF, PLIF and MIDLF procedures, the titanium Catalyft™ PL expandable interbody features increased length and continuous adjustment up to 22º of lordosis.[2] Unique shapes allow optimal positioning and improved anterior rim engagement to minimize the risk of subsidence to aid in neuroforaminal decompression.[1] The grit blasted, titanium surface contributes to implant anti migration and osteoconduction.[3]



**Catalyft™ PL40**

Building upon the unique benefits of Catalyft™ PL, the titanium Catalyft™ PL40 expandable interbody provides 40% more surface area distally compared to the Catalyft™ PL implant, which allows for increased anterior rim contact to reduce the risk of subsidence.[1] The anatomic beveled tip allows for greater apophyseal ring contact and ease of insertion.[4]

Source: https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html (accessed September 9,

2025). Therefore, for present purposes, the Catalyft PL is representative of the Catalyft PL40,

and vice versa. Unless otherwise noted, Plaintiff's allegations regarding infringement by either

Catalyft product applies to both Catalyft products.

63.    To the extent that the preamble is limiting, the Catalyft PL is a bone fusion device

for insertion between adjacent bones.

64.    According to Medtronic's published "Instructions for Use" Manual (Ex. 26,

Manual Document Number: M333023W048EU REV. B, which Medtronic publishes online), the

Catalyft PL "device is a fusion device intended for stabilization and to promote bone fusion

during the normal healing process following surgical correction of disorders of the spine." Ex.

26 ("Purpose"); *see also id*. at "Description" ("The Catalyft™ PL Expandable Interbody System

is an expandable titanium alloy interbody device consisting of expandable interbodies of various

widths, lengths, heights, and lordotic angles to accommodate patient anatomy. These devices can

be inserted between two lumbar or lumbosacral vertebral bodies to give support and correction

during lumbar interbody fusion surgeries. Implants have a central cavity that allows them to be

packed with autogenous bone graft and/or allograft bone graft comprised of cancellous and/or

corticocancellous bone, and/or demineralized allograft bone with bone marrow aspirate."); *see*

*also id*. at "Indications" ("The Catalyft™ PL Expandable Interbody System is indicated for use

as an intervertebral body fusion device in skeletally mature patients with degenerative disc

disease . . . at one or two contiguous levels of the lumbar spine (L2-S1). . . . Implants are used to

facilitate fusion in the lumbar spine using autogenous bone graft and/or allograft bone graft

comprised of cancellous and/or corticocancellous bone, and/or demineralized allograft bone with

bone marrow aspirate."). *See also* Ex. 27 (May 24, 2021 letter from FDA to Medtronic, with

enclosure).

65.     Medtronic on its website provides a video demonstrating that the Catalyft PL is a

bone fusion device for insertion between adjacent bones, as demonstrated by the following

exemplary screenshot:



Source: https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html

(accessed September 9, 2025).

66.     Medtronic on this same website includes a picture of its "StealthStation™ Navigation" system which enables "real time visualization" of the Catalyft PL being inserted between adjacent bones:

## Clear visualization with active expansion technology



Catalyft™ PL Expandable Interbody System seamlessly integrates with StealthStation™ Navigation, enabling real time visualization and streamlined workflow to support minimally invasive procedures.[1]

StealthStation™ Navigation features Virtual Expansion Technology, offering the ability to see the Catalyft™ PL and PL40 implants implant in both collapsed and expanded positions prior to implantation to optimize surgical planning.[1]

67.    Medtronic on this same website includes a picture of the Catalyft PL inserted between adjacent bones, wherein the "Grafton™ DBF Inject boosts seamless fusion by flowing through the inserted and expanded implant to completely fill the disc space":

## All-in-one Bone Graft delivery



### Seamlessly integraded Bone Graft delivery

The integrated design of Catalyft™ PL expandable interbody system and Grafton™ DBF inject* streamlines the workflow and precisely delivers bone graft.[1]

Grafton™ DBF Inject* boosts seamless fusion by flowing through the inserter and expanded implant to completely fill the disc space.

*Grafton™ DBF Inject can be used with the Catalyft™ PL Expandable Interbody System when hydrated with bone marrow aspirate (BMA).

68.    Medtronic on this same website refers to certain "Internal Reports": (1) "Medtronic Internal Report: Catalyft™ PL Implant/Instrument Design Validation (Anatomical

and Navigation Simulated Use) Report. Document GC17012_TP_007 RPT, version B. Revision date: 02 05 2021"; (2) "Medtronic Internal Report: 6068073/9116 - C82886, rev B. Revision date: 05 07 2021"; (3) "Medtronic Internal Report: 6068073/8116 01 C81951, rev A. Date: 20 01 2021. Medtronic Internal Report: 6068073/8116 02 C81951, rev A. Date: 20 01 2021"; and (4) "Medtronic Internal Report: Catalyft PL Tip Design Rationale - GC17012_GM_044, rev. A. Revision Date:07 21 202."  Upon information and belief, these Medtronic Internal Reports further verify that the Catalyft PL infringes at least claim 15 of the '280 patent.

69.    Further, on its website (Ex. 23,

https://www.medtronic.com/content/dam/medtronic-wide/public/cema/customer-support-services/medtronic-us-patent-list.pdf), Medtronic represents that U.S. Patent No. 10,238,503 discloses the relevant structure of the Catlyft PL. The specification of that patent states that the purported invention is a "spinal implant system" that may "be used as a fusion device with an expandable height for tailoring the implant in a particular interbody disc space to restore the spacing between adjacent vertebral bodies and facilitate spinal fusion between the adjacent veritable bodies" (Col. 6:35-40); *see also* Figures 1-41.

70.    Medtronic on its website provides a video showing that the Catalyft PL has a hollow body having one or more holes along a length of the hollow body, as demonstrated by the following exemplary screenshots:





Source https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html (accessed September 9, 2025). Further, information that Medtronic submitted to the FDA confirms that Catalyft PL "implants are designed with a hollow center region to house autogenous bone graft and/or allograft bone graft comprised of cancellous and/or corticocancellous bone, and/or demineralized

allograft bone with bone marrow aspirate." *See* Ex. 27 (May 24, 2021 letter from FDA to

Medtronic, with enclosure) under "Description of Devices." *See also* U.S. Patent No.

10,238,503 at Figures 1-41.

71.    Medtronic on its website provides a video showing that the Catalyft PL has one or

more moveable tabs each attached to the hollow body by a pin and a slot, as demonstrated by the

following exemplary screenshot:



Source https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-

orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html (accessed September 9,

2025). *See also* U.S. Patent No. 10,238,503 at Figures 1-41.

72.    Medtronic on its website provides a video showing that the Catalyft PL has the

one or more moveable tabs discussed previously, where the tabs are aligned along a surface of

the hollow body in a compact position during insertion into a patient, as demonstrated by the

following exemplary screenshot:



Source https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html (accessed September 9, 2025). *See also* U.S. Patent No. 10,238,503 at Figures 1-41.

73.    Medtronic on its website provides a video showing that the Catalyft PL has the one or more moveable tabs, wherein each of the one or more moveable tabs comprises an outer surface, an angled inner surface, a first side end and a second side end, wherein each of the one or more moveable tabs is shaped such that the first side end is substantially larger than the second side end and a size of the tab in between gradually decreases while going from the first side end to the second side end, as demonstrated by the following exemplary screenshot:



Source https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html (accessed September 9, 2025). *See also* U.S. Patent No. 10,238,503 at Figures 1-41.

74.     Medtronic on its website provides a video showing that the Catalyft PL has a positioning element coupled through the hollow body and substantially within the hollow body, as demonstrated by the following exemplary screenshot:



Source https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html (accessed September 9, 2025). *See also* U.S. Patent No. 10,238,503 at Figures 1-41.

75.    Medtronic on its website provides a video showing that the Catalyft PL has an extending block coupled to the positioning element and comprising one or more angled surfaces abutting against the one or more tabs for moving the one or more moveable tabs when the positioning element is rotated, wherein the extending block moves towards a head of the positioning element to extend the one or more moveable tabs, as demonstrated by the following exemplary screenshot:



Source https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html (accessed September 9, 2025). *See also* U.S. Patent No. 10,238,503 at Figures 1-41.

76.    The Medtronic Elevate Expandable Interbody Device ("Elevate") also infringes at least claim 15 of the '280 patent.

77.    To the extent that the preamble is limiting, Elevate is a bone fusion device for insertion between adjacent bones.

78.    For example, Medtronic told the FDA that the Elevate "Spinal System" consists "of polyetheretherketone (PEEK) with tantalum markers and titanium expandable cages of various length and heights,  which can be surgically implanted between two lumbar or lumbarsacral vertebral  bodies to give support and correction during lumbar intervertebral body fusion."  Ex. 28 (June 9, 2015 letter from FDA to Medtronic, enclosure) under "Description."  *Id*. ("The hollow geometry of the implants allows them to be packed with autogenous bone graft. This system also includes stainless steel and silicone instruments used to facilitate the

implantation of the subject cages."). *Id*. under "Indications for Use" ("The ELEVATE™ Spinal

System Expandable Interbody Fusion Device is indicated for interbody fusion with autogenous

bone graft in patients with degenerative disc disease (DDD) at one or two contiguous levels from

L2 to S1. These DDD patients may also have up to Grade 1 Spondylolisthesis or retrolisthesis at

the involved levels. DDD is defined as discogenic back pain with degeneration of the disc

confirmed by history and radiographic studies. These patients should be skeletally mature and

have had six months of non-operative treatment. These implants may be implanted via an open

or a minimally invasive posterior approach. These implants are to be used with autogenous bone

graft. These devices are intended to be used with supplemental fixation instrumentation, which

has been cleared by the FDA for use in the lumbar spine.").

79.    Further, Medtronic published a "Surgical Technique" document stating that

Elevate "is a fusion device intended for stabilization and to promote bone fusion during the

normal healing process following surgical correction of disorders of the spine." *See* page 31

(available at

http://www.neurosurgeryresident.net/Op.%20Operative%20Techniques/00.%20Catalogs,%20Br

ochures,%20Manuals/Medtronic/Spine/Medtronic%20-

%20ELEVATE%20(expandable%20cage).pdf).  This document provides surgeons detailed

information about Elevate, how to implant it in patients with Elevate in the closed position, and

how to then "expand the implant" once it is placed in the proper location by turning a Torque

Handle:



*Id.* at 11.

80.    Further, on its website (Ex. 23,

https://www.medtronic.com/content/dam/medtronic-wide/public/cema/customer-support-

services/medtronic-us-patent-list.pdf), Medtronic represents that U.S. Patent No. 9,445,919

discloses the structure of Elevate.  The specification of that patent states that the purported

invention "generally relates to medical devices, systems and methods for the treatment of

musculoskeletal disorders, and more particularly to an expandable interbody implant system and method for treating a vertebral column." Col. 1:6-10; *see also* Col. 4:4-15 ("It is envisioned that the expandable interbody implant and methods of use disclosed herein can be employed to obtain fusion of vertebrae through a minimally invasive or percutaneous technique. In one embodiment, the disclosed expandable interbody implant and methods of use can provide improved spinal treatment with a device that is made to expand vertically to create lordosis in vertebrae. It is contemplated that the expandable interbody implant and methods of use disclosed herein provide a cavity of relatively large volume for post-packing of at least one agent, for example, bone graft."); *see also* Figures 1-28.

81.    Elevate has a hollow body having one or more holes along a length of the hollow body, as demonstrated by the following exemplary screenshot:



Source: https://www.youtube.com/watch?v=Jd81epSn7ho (accessed September 10, 2025). *See also* Pat. No. 9,445,919 at Figures 1-28.

82.    Elevate has one or more moveable tabs each attached to the hollow body by a pin and a slot, as demonstrated by the following exemplary screenshot:



Source: https://www.youtube.com/watch?v=Jd81epSn7ho (accessed September 10, 2025). *See also* Pat. No. 9,445,919 at Figures 1-28.

83.    Elevate has the one or more moveable tabs discussed previously, where the tabs are aligned along a surface of the hollow body in a compact position during insertion into a patient, as demonstrated by the following exemplary screenshots:





Source: https://www.youtube.com/watch?v=Jd81epSn7ho (accessed September 10, 2025). *See also* Pat. No. 9,445,919 at Figures 1-28.

84.    Elevate has the one or more moveable tabs as discussed previously, wherein each of the one or more moveable tabs comprises an outer surface, an angled inner surface, a first side end and a second side end, wherein each of the one or more moveable tabs is shaped such that the first side end is substantially larger than the second side end and a size of the tab in between gradually decreases while going from the first side end to the second side end, as demonstrated by the following exemplary screenshots:





Source: https://www.youtube.com/watch?v=Jd81epSn7ho (accessed September 10, 2025). *See also* Pat. No. 9,445,919 at Figures 1-28.

85.    Elevate has a positioning element coupled through the hollow body and substantially within the hollow body, as demonstrated by the exemplary screenshots above. *See also* Pat. No. 9,445,919 at Figures 1-28.

86.    Elevate has an extending block coupled to the positioning element and comprising one or more angled surfaces abutting against the one or more tabs for moving the one or more moveable tabs when the positioning element is rotated, wherein the extending block moves towards a head of the positioning element to extend the one or more moveable tabs, as demonstrated by the exemplary screenshots above. *See also* Pat. No. 9,445,919 at Figures 1-28.

87.    Medtronic has also indirectly infringed and continues to indirectly infringe at least claim 15 of the '280 patent by actively inducing, in violation of 35 U.S.C. §§ 271(b) and/or

271(f)(1), the direct infringement of at least claim 15 of the '280 patent by others. Medtronic has also indirectly infringed and continues to indirectly infringe at least claim 15 of the '280 patent by supplying or causing to be supplied in or from the United States, offering to sell or selling in the United States, or importing into the United States, in violation of 35 U.S.C. §§ 271(c) and/or 271(f)(2), one or more components of a patented apparatus, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in the direct infringement of at least claim 15 of the '280 patent by others, or knowing that such components will be combined outside of the United States in a manner that would infringing if such combination occurred within the United States, wherein component or components of the patented apparatus supplied or sold by Medtronic are not a staple article or commodity of commerce suitable for substantial non-infringing use.

88.     Medtronic has induced, and continues to induce, through affirmative acts, its direct and indirect customers and other third parties, including exporters, importers, resellers, hospitals, doctors, and other end users, to directly infringe at least claim 15 of the '280 patent by using, offering to sell, selling with the United States, importing into the United States, exporting from the United States, and/or performing the methods of, the Medtronic Accused Instrumentalities.

89.     Medtronic sought and obtained FDA approval to market the Medtronic Accused Instrumentalities in the United States. For example, the FDA provided 510(k) Premarket Notification for Elevate (*see* 510(k) Number K142559, available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K142559) and the FDA provide 510(k) Premarket Notification for various Catalyft products (*see* 510(k) Numbers K210425, K212653, K214011, K223153, and K241992, available at

https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm).  Medtronic has actively

promoted use of the Medtronic Accused Instrumentalities and has provided instructions for doing

so.  For example, Medtronic advertises use of Catalyft with its "Grafton™ family of DBM

products" that offer "an injectable format with handling characteristics suited to minimally

invasive procedures:

# Grafton™ DBF Inject

## A premium injectable Bone Graft solution



From the Grafton™ family of DBM products that offers an injectable format
with handling characteristics suited to minimally invasive procedures.

Source: https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-

orthopaedic/bone-grafting/grafton-dbf-inject.html (Ex. 29, accessed September 10, 2025). On

this same website, Medtronic states that "Grafton™ DBF Inject seamlessly integrates with

Catalyft™ with bone graft flowing through the inserter and expanded into implant to completely

fill the disc space."  On this same website, Medtronic states that its Grafton injection system and

the Catalyft are "related" products:

# Related products



**Catalyft PL**

Titanium expandable interbody system

90.    This brochure (Ex. 29) shows that Medtronic intends and instructs that end users (*e.g.*, hospitals and doctors) use Catalyft and/or Elevate interbody cages with the Grafton BDF Inject System, which includes a delivery apparatus:



91.    Medtronic knew that its customers or end users would use, offer to sell, sell, and

perform the methods of the Medtronic Accused Instrumentalities in the United States, and

Medtronic specifically intended its customers, direct and indirect, and end users to purchase

Medtronic Accused Instrumentalities for use in and/or importation into the United States, and it

provided instructions for how to do so. Medtronic's direct and indirect purchasers directly

infringe at least claim 15 of the '280 patent by importing the Medtronic Accused

Instrumentalities into the United States, selling or offering to sell the Medtronic Accused

Instrumentalities in the United States, exporting the Medtronic Accused Instrumentalities and

material components thereof for use abroad in a manner that would infringe if done in the United

States, and/or using the Medtronic Accused Instrumentalities in the United States.

92.    Medtronic knew that its (direct and indirect) customers and end users (*e.g.*,

hospitals and doctors) would use, sell, offer to sell, and/or perform the methods of, the Medtronic

Accused Instrumentalities in the United States, and Medtronic specifically intended its customers

or end users to purchase for use and/or perform the methods of the Medtronic Accused

Instrumentalities in the United States.

93.    Medtronic has induced and contributed to direct infringement by others despite

the fact that, as discussed above (*see* "Medtronic's Pre-Suit Knowledge of Infringement," *supra*),

it actually knew that the Medtronic Accused Instrumentalities directly infringe the asserted

claims of the Asserted Patents.

94.    Medtronic's direct and indirect infringement has been and continues to be willful.

Again, as discussed above (*see* "Medtronic's Pre-Suit Knowledge of Infringement," *supra*),

Medtronic actually knew that the Medtronic Accused Instrumentalities directly infringe the

asserted claims of the Asserted Patents.

95.    Medtronic, through its acts of infringement described above, has caused and

continues to cause injury and damage to Plaintiff. Plaintiff is entitled to recover damages as a

result of Medtronic's infringement in an amount to be proved, but in no event less than a

reasonable royalty. The patent marking statute does not bar recovery of pre-suit damages

because no owner or licensee of the '280 patent has previously sold un-marked articles covered

by any asserted claim of the '280 patent.

96.     Medtronic knew or was willfully blind to the patented technology of the '280

Patent (*see* "Medtronic's Pre-Suit Knowledge of Infringement," *supra*). As discussed

previously, Plaintiff provided Medtronic with details regarding its patented technology beginning

in October 2010 and Medtronic was aware there was a high probability of infringement, but it

nonetheless made the deliberate choice to ignore or avoid knowledge of its infringement.

Medtronic acted with blatant disregard and conscious avoidance of Plaintiff's patent rights

despite an objectively high likelihood of infringement.

97.     Medtronic has made no efforts to avoid infringement of the '280 Patent, despite

its knowledge and understanding that its products, systems, and/or methods necessarily are used

to infringe claims of the '280 Patent.

98.     Therefore, Medtronic's infringement of the asserted claims of the '280 Patent has

been, and continues to be, willful and Plaintiff is entitled to enhanced damages under 35 U.S.C. §

284, and attorneys' fees and costs incurred under 35 U.S.C. § 285.

## COUNT II — INFRINGEMENT OF U.S. PATENT NO. 10,213,321

99.     Plaintiffs reallege and incorporate by reference the allegations in the preceding

paragraphs as if set forth fully herein.

100.    The '321 patent underwent a thorough examination at the Patent Office and is

presumed valid under 35 U.S.C. § 282.

101.    Medtronic has directly infringed and continues to directly infringe one or more claims of the '321 patent in violation of 35 U.S.C. § 271(a), by, *inter alia*, performing the methods of the Medtronic Accused Instrumentalities.

102.    The following paragraphs describe how use of certain Medtronic Accused Instrumentalities indirectly infringe at least claim 11 of the '321 patent. Plaintiff's allegations of infringement are not limited to claim 11, or to the specific methods or products referenced herein, and Plaintiff may identify and disclose additional infringement through discovery and in infringement contentions under the Local Patent Rules.

103.    Medtronic on its website describes a method of operation of a bone fusion system. As stated and pictured in a 2024 Medtronic brochure (Ex. 29, https://europe.medtronic.com/content/dam/medtronic-wide/public/western-europe/medical-specialties/spine-surgery/dbf-inject-digital-brochure-en.pdf), the integrated design of the Catalyft™ PL Expandable Interbody System and Grafton™ DBF streamlines the workflow and precisely delivers bone graft" and "Grafton™ DBF inject seamlessly integrates with the Catalyft™ inserter to flow through the expanded implant to completely fill the disc space."



104.    Medtronic on its website provides a video showing that the provided Catalyft PL

is a bone fusion device having body with one or more device channels:



Source: https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html (Accessed September 11, 2025)

105.    Medtronic on its website provides a video showing the Catalyft PL has a positioning element having a positioning aperture and one or more extendable tabs, wherein manipulation of the positioning element enables the tabs to be extended away from the body:



Source: https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html (Accessed September 11, 2025)

106.    Medtronic on its website (https://europe.medtronic.com/content/dam/medtronic-wide/public/western-europe/medical-specialties/spine-surgery/dbf-inject-digital-brochure-en.pdf) provides a brochure demonstrating how a docking rod detachably couples with the Catalyst PL device by inserting a tip of the docking rod within the positioning aperture of the device.



Medtronic on its website also provides a video showing a docking rod detachably coupling with the Catalyft PL bone fusion device by inserting a tip of the docking rod within the positioning aperture of the device:



Source: https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html

107.    Medtronic on its website (https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html)  provides a brochure showing a delivery member that has an elongated hollow shaft that leads to an exit aperture.

### All-in-one Bone Graft delivery



#### Seamlessly integraded Bone Graft delivery

The integrated design of Catalyft™ PL expandable interbody system and Grafton™ DBF inject* streamlines the workflow and precisely delivers bone graft.¹

Grafton™ DBF Inject* boosts seamless fusion by flowing through the inserter and expanded implant to completely fill the disc space.

*Grafton™ DBF Inject can be used with the Catalyft™ PL Expandable Interbody System when hydrated with bone marrow aspirate (BMA).

108.    Medtronic on its website (https://europe.medtronic.com/content/dam/medtronic-wide/public/western-europe/medical-specialties/spine-surgery/dbf-inject-digital-brochure-en.pdf)

also provides a brochure that shows an exit aperture aligned with one of the device channels when coupled to the docking rods.



109.    A video Medtronic posts on its website further demonstrates the delivery member detachably couples with the docking rod such that the exit aperture aligns with one of the device channels when the rod is coupled to the bone fusion device:



Source: https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html (Accessed Sept. 11, 2025).

110.    Medtronic on its website (https://europe.medtronic.com/content/dam/medtronic-wide/public/western-europe/medical-specialties/spine-surgery/dbf-inject-digital-brochure-en.pdf) provides a brochure showing a delivery member includes a funneling chamber having a threaded chamber end, wherein the elongated hollow shaft provides a path from the funneling chamber to the exit aperture.



A video on Medtronic's website demonstrates the end of the funneling chamber being turned by a threaded end and connected to the docking rod, leading to the exit aperture.



Source: https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html

111.    Medtronic has also indirectly infringed and continues to indirectly infringe at least claim 11 of the '321 patent by, *inter alia*, actively inducing, in violation of 35 U.S.C. §§ 271(b) and/or 271(f)(1), the direct infringement of at least claim 11 of the '321 patent by others. Medtronic has also indirectly infringed and continues to indirectly infringe at least claim 1 of the '321 patent by supplying or causing to be supplied in or from the United States, offering to sell or selling in the United States, or importing into the United States, in violation of 35 U.S.C. §§ 271(c), a component or components for use in practicing the patented process of at least claim 11 of the '321 patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in the direct infringement of at least claim 11 of the '321 patent by others, wherein each such component or components supplied or sold by Medtronic is not a staple article or commodity of commerce suitable for substantial non-infringing use.

112.    Medtronic has induced, and continues to induce, through affirmative acts, its customers and other third parties, including exporters, importers, resellers, hospitals, doctors, and other end users, to directly infringe at least claim 11 of the '321 patent.

113.    Medtronic sought and obtained FDA approval to market the Medtronic Accused Instrumentalities in the United States. For example, the FDA provided 510(k) Premarket Notification for Elevate (*see* 510(k) Number K142559, available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K142559) and the FDA provide 510(k) Premarket Notification for various Catalyft products (*see* 510(k) Numbers K210425, K212653, K214011, K223153, and K241992, available at

https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm).  Medtronic has actively

promoted use of the Medtronic Accused Instrumentalities. For example, Medtronic advertises

use of Catalyft with its "Grafton™ family of DBM products" that offer "an injectable format

with handling characteristics suited to minimally invasive procedures:

# Grafton™ DBF Inject

## A premium injectable Bone Graft solution

From the Grafton™ family of DBM products that offers an injectable format
with handling characteristics suited to minimally invasive procedures.



Source: https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-

orthopaedic/bone-grafting/grafton-dbf-inject.html (accessed September 10, 2025). On this same

website, Medtronic states that "Grafton™ DBF Inject seamlessly integrates with Catalyft™ with

bone graft flowing through the inserter and expanded into implant to completely fill the disc

space."  On this same website, Medtronic states that its Grafton injection system and the Catalyft

are "related" products:

# Related products



**Catalyft PL**

Titanium expandable interbody system

114.     This brochure (Ex. 29) shows that Medtronic intends that end users (*e.g*., hospitals and doctors) use Catalyft and/or Elevate interbody cages with the Grafton BDF Inject System:



115. Medtronic knew, intended, and instructed that its direct and indirect customers or end users would, *inter alia*, perform the methods of the Medtronic Accused Instrumentalities in

the United States, and Medtronic specifically intended its customers or end users to purchase

Medtronic Accused Instrumentalities for use in such methods in the United States and elsewhere.

Medtronic's direct and indirect purchasers directly infringe by, *inter alia*, using the Medtronic

Accused Instrumentalities to perform at least the method of claim 11 of the '321 patent in the

United States and elsewhere.

116.    Medtronic knew, intended, and instructed that its direct and indirect customers or

end users (*e.g.*, hospitals and doctors) would use, sell, and/offer to sell the Medtronic Accused

Instrumentalities in the United States for the purpose of performing at least the method of claim

11 of the '321 patent, and Medtronic specifically intended its customers and end users to

purchase Medtronic Accused Instrumentalities for such use in the United States and elsewhere.

117.    Medtronic has induced and contributed to direct infringement by others despite

the fact that it actually knew that the Medtronic Accused Instrumentalities necessarily are used to

directly infringe.

118.    Medtronic, through its acts of infringement described above, has caused and

continues to cause injury and damage to Plaintiff. Plaintiff is entitled to recover damages as a

result of Medtronic's infringement in an amount to be proved, but in no event less than a

reasonable royalty.  The patent marking statute does not bar recovery of pre-suit damages for

infringement of method claims of the '321 patent, because there is no duty to mark methods.

119.    Medtronic knew or was willfully blind to the patented technology of the '321

Patent (*see* "Medtronic's Pre-Suit Knowledge of Infringement," *supra*).  As discussed

previously, Plaintiff provided Medtronic with details regarding its patented technology beginning

at least as early as October 2010 and Medtronic was aware there was a high probability of

infringement, but it nonetheless made the deliberate choice to ignore or avoid knowledge of its

infringement. Medtronic acted with blatant disregard and conscious avoidance of Plaintiff's patent rights despite an objectively high likelihood of infringement.

120.    Medtronic has made no efforts to avoid infringement of the '321 Patent, despite its knowledge and understanding that its products and systems necessarily are used to infringe claims of the '321 Patent.

121.    Therefore, Medtronic's infringement of the '321 Patent has been, and continues to be, willful and Plaintiff is entitled to enhanced damages under 35 U.S.C. § 284, and attorneys' fees and costs incurred under 35 U.S.C. § 285.

## COUNT III — INFRINGEMENT OF U.S. PATENT NO. 11,141,289

122.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs as if set forth fully herein.

123.    The '289 patent underwent a thorough examination at the Patent Office and is presumed valid under 35 U.S.C. § 282.

124.    Medtronic has directly infringed and continues to directly infringe one or more claims of the '289 patent in violation of 35 U.S.C. § 271(a), by, *inter alia*, performing the methods of the Medtronic Accused Instrumentalities.

125.    The following paragraphs describe how certain exemplary methods of the Medtronic Accused Instrumentalities infringe at least claim 11 of the '289 patent. Plaintiff's allegations of infringement are not limited to claim 11, or to the specific methods or products referenced herein, and Plaintiff may identify and disclose additional infringement through discovery and in infringement contentions under the Local Patent Rules.

126.    Medtronic on its website describes a method of operation of a bone fusion system. As stated and pictured in a 2024 Medtronic brochure

(https://europe.medtronic.com/content/dam/medtronic-wide/public/western-europe/medical-specialties/spine-surgery/dbf-inject-digital-brochure-en.pdf), the integrated design of the Catalyft™ PL Expandable Interbody System and Grafton™ DBF streamlines the workflow and precisely delivers bone graft" and "Grafton™ DBF inject seamlessly integrates with the Catalyft™ inserter to flow through the expanded implant to completely fill the disc space."



127.    Medtronic on its website provides a video showing that the provided Catalyft PL is a bone fusion device having a bone fusion body:



Source: https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html (Accessed September 11, 2025)

128.    Medtronic on its website (https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html) provides a brochure showing a delivery member used to detachably couple to a docking rod wherein the delivery member has an elongated hollow shaft that leads to an exit aperture:

## All-in-one Bone Graft delivery



### Seamlessly integraded Bone Graft delivery

The integrated design of Catalyft™ PL expandable interbody system and Grafton™ DBF inject* streamlines the workflow and precisely delivers bone graft.[1]

Grafton™ DBF Inject* boosts seamless fusion by flowing through the inserter and expanded implant to completely fill the disc space.

*Grafton™ DBF Inject can be used with the Catalyft™ PL Expandable Interbody System when hydrated with bone marrow aspirate (BMA).

129.    Medtronic on its website (https://europe.medtronic.com/content/dam/medtronic-wide/public/western-europe/medical-specialties/spine-surgery/dbf-inject-digital-brochure-en.pdf) also provides a brochure that shows an exit aperture formed by an L-Shaped cutout of the elongated hollow shaft:



130.    Medtronic on its website (https://europe.medtronic.com/content/dam/medtronic-wide/public/western-europe/medical-specialties/spine-surgery/dbf-inject-digital-brochure-en.pdf) provides a brochure showing the delivery member includes a funneling chamber having a narrow end proximate the elongated hollow shaft and a threaded chamber end opposite the narrow end, wherein the elongated hollow shaft provides a patent from the funneling chamber to the exit aperture.



A video on Medtronic's website demonstrates the end of the funneling chamber being turned by a threaded end and connected to the docking rod, leading to the exit aperture.



Source: https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-orthopaedic/posterior-interbody-fusion/catalyft-interbody-system.html.

131.    Medtronic has also indirectly infringed and continues to indirectly infringe at least claim 11 of the '289 patent by actively inducing, in violation of 35 U.S.C. §§ 271(b), the direct infringement of at least claim 11 of the '289 patent by others. Medtronic has also indirectly infringed and continues to indirectly infringe at least claim 11 of the '289 patent by supplying or causing to be supplied in or from the United States, offering to sell or selling in the United States, or importing into the United States, in violation of 35 U.S.C. §§ 271(c), one or more components for use in practicing the patented process of at least claim 11 of the '289 patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in the direct infringement of at least claim 11 of the '289 patent by others, wherein each such component or components of the patented apparatus supplied or sold by Medtronic is not a staple article or commodity of commerce suitable for substantial non-infringing use.

132.    Medtronic has induced, and continues to induce, through affirmative acts, its customers and other third parties, including exporters, importers, resellers, hospitals, doctors, and other end users, to directly infringe at least claim 11 of the '289 patent.

133.    Medtronic sought and obtained FDA approval to market the Medtronic Accused Instrumentalities in the United States. For example, the FDA provided 510(k) Premarket Notification for Elevate (*see* 510(k) Number K142559, available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K142559) and the FDA provide 510(k) Premarket Notification for various Catalyft products (*see* 510(k) Numbers K210425, K212653, K214011, K223153, and K241992, available at

https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm).  Medtronic has actively

promoted use of the Medtronic Accused Instrumentalities. For example, Medtronic advertises

use of Catalyft with its "Grafton™ family of DBM products" that offer "an injectable format

with handling characteristics suited to minimally invasive procedures:

# Grafton™ DBF Inject

## A premium injectable Bone Graft solution



From the Grafton™ family of DBM products that offers an injectable format
with handling characteristics suited to minimally invasive procedures.

Source: https://europe.medtronic.com/xd-en/healthcare-professionals/products/spinal-
orthopaedic/bone-grafting/grafton-dbf-inject.html (accessed September 10, 2025). On this same

website, Medtronic states that "Grafton™ DBF Inject seamlessly integrates with Catalyft™ with

bone graft flowing through the inserter and expanded into implant to completely fill the disc

space."  On this same website, Medtronic states that its Grafton injection system and the Catalyft

are "related" products:

# Related products



**Catalyft PL**

Titanium expandable interbody system

134.     This brochure (Ex. 29) shows that Medtronic intends that end users (*e.g.*, hospitals and doctors) use Catalyft and/or Elevate interbody cages with the Grafton BDF Inject System, which includes a delivery apparatus:



135.    Medtronic knew that its direct and indirect customers or end users would, *inter alia*, perform the methods of the Medtronic Accused Instrumentalities in the United States, and

Medtronic specifically intended its customers or end users to purchase Medtronic Accused Instrumentalities for use of such methods in the United States and elsewhere. Medtronic's direct and indirect purchasers directly infringe at least claim 11 of the '289 patent by, *inter alia*, using the Medtronic Accused Instrumentalities to perform at least the method of claim 11 of the '289 patent in the United States and elsewhere.

136.    Medtronic knew that its direct and indirect customers and end users (*e.g.*, hospitals and doctors) would use, sell, and/offer to sell the Medtronic Accused Instrumentalities in the United States for the purposes of performing at least the method of claim 11 of the '321 patent, and Medtronic specifically intended its customers and end users to purchase Medtronic Accused Instrumentalities for such use in the United States and elsewhere.

137.    Medtronic has induced and contributed to direct infringement by others despite the fact that it actually knew that the Medtronic Accused Instrumentalities necessarily are used to directly infringe.

138.    Medtronic, through its acts of infringement described above, has caused and continues to cause injury and damage to Plaintiff. Plaintiff is entitled to recover damages as a result of Medtronic's infringement in an amount to be proved, but in no event less than a reasonable royalty.  The patent marking statute does not bar recovery of pre-suit damages for infringement of method claims of the '289 patent, because there is no duty to mark methods.

139.    Medtronic knew or was willfully blind to the patented technology of the '289 Patent (*see* "Medtronic's Pre-Suit Knowledge of Infringement," *supra*).  As discussed previously, Plaintiff provided Medtronic with details regarding its patented technology at least as early as October 2010 and Medtronic was aware there was a high probability of infringement, but it nonetheless made the deliberate choice to ignore or avoid knowledge of its infringement.

Medtronic acted with blatant disregard and conscious avoidance of Plaintiff's patent rights despite an objectively high likelihood of infringement.

140.    Medtronic has made no efforts to avoid infringement of the '289 Patent, despite its knowledge and understanding that its products and systems necessarily are used to infringe claims of the '289 Patent.

141.    Therefore, Medtronic's infringement of the '289 Patent has been, and continues to be, willful and Plaintiff is entitled to enhanced damages under 35 U.S.C. § 284, and attorneys' fees and costs incurred under 35 U.S.C. § 285.

## **PRAYER FOR RELIEF**

For the reasons stated above, Plaintiff prays for relief as follows:

A.     A judgment that Defendants have willfully infringed, directly and/or indirectly, one or more claims of each of the Asserted Patents;

B.     Compensatory damages in an amount commensurate with Defendants' infringement of the asserted claims of the Asserted Patents, including without limitation lost profits and no less than a reasonable royalty;

C.     Entry of a permanent injunction enjoining Defendants from employing the infringing, or inducing or contributing to the infringement of, any of the Asserted Patents by the Medtronic Accused Instrumentalities;

D.     Pre-judgment interest on all damages awarded to Plaintiff;

E.     Post-judgment interest on all sums awarded to Plaintiff from the date of the judgment;

F.     An award of treble damages pursuant to 35 U.S.C. § 284;

G.     An award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285; and

H.     Any and all other relief that the Court deems just and equitable.

## <u>JURY DEMAND</u>

142.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury of all claims in this action so triable.

Dated: September 22, 2025

Respectfully submitted,

_s/ Todd R. Hambidge_
Todd R. Hambidge (TN Bar No. 28671)
Holland & Knight LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219-8966
Tel.: 615.244.6380
Fax: 615.244.6804
todd.hambidge@hklaw.com

Kristopher L. Reed (TX Bar No. 24130416)
(_pro hac vice to be filed_)
Adrienne E. Dominguez (TX State Bar No.
00793630) (_pro hac vice to be filed_)
Holland & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Tel.: 214.969.1700
Fax: 214.969.1751
kris.reed@hklaw.com
adrienne.dominguez@hklaw.com

Kenneth S. Chang  (CO Bar No. 35353) (_pro hac vice to be filed_)
Edward J. Mayle  (CO Bar No. 50920) (_pro hac vice to be filed_)
Holland & Knight LLP
1801 California Street, Suite 5000
Denver, CO  80202
Tel.: 303.974.6660
Fax: 303.974.6659
kenneth.chang@hklaw.com
edward.mayle@hklaw.com

_Attorneys for Plaintiff_